UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SARAH COSME,

                      Plaintiff,

          v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                     Defendant.
_____

<u>DECISION & ORDER</u>

15-CV-6121P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Sarah Cosme ("Cosme") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 12).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 14). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Cosme's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.     Procedural Background

Cosme filed for SSI alleging disability beginning on August 1, 2013, as a result of depression, anxiety, anger issues, emotional disturbance, and borderline personality disorder. (Tr. 241, 277).[1]  On November 14, 2013, the Social Security Administration denied Cosme's claim for benefits, finding that she was not disabled.[2]  (Tr. 114-24).  Cosme requested and was granted a hearing before Administrative Law Judge Brian Kane (the "ALJ").  (Tr. 130-32, 144-48).  The ALJ conducted a hearing on June 6, 2014.  (Tr. 81-113).  Cosme was represented at the hearing by her attorney, Justin Goldstein, Esq.  (Tr. 81, 183).  In a decision dated August 25, 2014, the ALJ found that Cosme was not disabled and was not entitled to benefits. (Tr. 14-29).

On January 6, 2015, the Appeals Council denied Cosme's request for review of the ALJ's decision.  (Tr. 1-4).  Cosme commenced this action on March 5, 2015 seeking review of the Commissioner's decision.  (Docket # 1).

## II.    Relevant Medical Evidence[3]

### A.     Treatment Records Evelyn Brandon Health Center

Treatment notes indicate that Cosme began receiving treatment at the Evelyn Brandon Health Center ("EBHC") on April 25, 2011.  (Tr. 371-75).  She was diagnosed by Mary A. Coughtry ("Coughtry"), PsyD, with depressive disorder, not otherwise specified, and borderline personality disorder.  (*Id.*).

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Cosme previously applied for and was denied benefits in a decision dated October 26, 2011.  (Tr. 278).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

On May 23, 2013, she attended an appointment with Muhammad Dawood ("Dawood"), MD, for medication management.  (*Id.*).  During the appointment, she recounted being physically assaulted by her boyfriend and obtaining an order of protection.  (*Id.*).  She indicated that her medication was helpful, but complained of night sweats and bad dreams.  (*Id.*).  She reportedly had been off her medications for the previous two months.  (*Id.*).  Dawood restarted her medications, noting that she suffered from a chronic condition but would likely benefit from her medications.  (*Id.*).

On August 19, 2013, Cosme returned for an appointment with Gerhardt Wagner ("Wagner"), MD.  (Tr. 365-70).  Wagner noted that Cosme had reported suffering physical abuse as a child until she was placed into foster care at the age of ten.  (*Id.*).  She also reported a history of sexual abuse.  (*Id.*).  Wagner's notes reflect that when Cosme was sixteen she attempted suicide by hanging.  (*Id.*).  According to Cosme, she experiences feelings of anger and a desire to hurt anyone who offends or bothers her.  (*Id.*).  She also reported difficulty sleeping, but acknowledged that her medications, including Trazodone and Seroquel were helpful.  Cosme reported that she lived with her eight-year-old son.  (*Id.*).  Cosme's mother provided support, but Cosme did not associate with her five siblings.  (*Id.*).  At her request, Wagner increased the dosage of her medications.  (*Id.*).

On August 26, 2013, Cosme attended a therapy session with Coughtry. (Tr. 361-64).  Coughtry discussed coping mechanisms for Cosme to use to work through pain from her past.  (*Id.*).  They also discussed Cosme's son, who would be starting school the following week after spending the summer with his aunt, Cosme's sister.  (*Id.*).  Cosme also reported that she had begun a new relationship and appeared to be less depressed.  (*Id.*).

Cosme attended two appointments with Coughtry in September 2013. (Tr. 353-60).  During the first appointment, on September 4, Cosme reported that she was doing well and that she did not feel like "hurting people," which she attributed to her new boyfriend. (Tr. 357-60).  Coughtry opined that Cosme has higher than reasonable expectations of children due to her upbringing and that she suffered from low-grade paranoia, which likely causes her to misperceive things.  (*Id.*).  On September 25, 2013, Cosme presented "full of rage," due to suffering from a cold and having a confrontation with her mother.  (Tr. 353-56).  Cosme reported that her mother expressed that Cosme took advantage of her and that Cosme responded by threatening violence.  (*Id.*).  Cosme explained that she did not trust her mother and that she felt the only way to convince her mother to take her seriously was to threaten violence and be willing to follow through on those threats.  (*Id.*).  Cosme also expressed frustration with Coughtry because Coughtry had completed a form indicating that Cosme was capable of completing five hours of work for the Work Experience Program ("WEP") program.  (*Id.*).

Cosme met with Coughtry twice and Wagner once during October 2013. (Tr. 449-62).  Wagner noted that Cosme complained of auditory hallucinations, which she experienced on a daily basis.  (*Id.*).  Cosme reported that she first heard voices at the age of eight.  (*Id.*).  Cosme felt that an increased dosage of Seroquel had successfully reduced the intensity of her hallucinations and assisted her in controlling her emotions.  (*Id.*).  Wagner decided to increase Cosme's Celexa dosage to address her continued irritability.  (*Id.*).  Cosme met with Coughtry later that same day, October 21, 2013.  (*Id.*).  Cosme reported feeling depressed and sleeping most of the time.  (*Id.*).  She continued to report ongoing issues with her family, including her inability to trust them.  (*Id.*).

During her next appointment with Coughtry on October 28, 2013, Cosme reported that she was hurting herself, drawing on herself, and experiencing panic attacks and nightmares during her sleep. (Tr. 459-62). Coughtry encouraged Cosme to express her feelings of sadness and vulnerability instead of becoming angry or acting out. (*Id.*). Coughtry opined that Cosme had difficulty feeling sad or vulnerable due to her childhood experiences. (*Id.*).

Cosme met with Coughtry twice during December 2013. (Tr. 463-71). On December 5, 2013, Cosme presented as mildly depressed and reported that she had recently been hospitalized for a seizure. (*Id.*). Coughtry noted that Cosme had failed to attend or cancel previous therapy sessions. (*Id.*). Cosme explained that her poor attendance was due to addressing benefits issues with the Department of Social Services and working through the WEP program. (*Id.*). Cosme recommitted to treatment. (*Id.*). She also expressed that she believed her stress resulted from the termination of her relationship with her previous boyfriend. (*Id.*). Coughtry encouraged Cosme to grieve the end of the relationship. (*Id.*). On December 20, 2013, Cosme reported that she was applying for disability, indicating that her memory had been less reliable since her seizure. (*Id.*). Coughtry suggested that Cosme consider working with Access Vocation Rehabilitation to assist her in finding employment. (*Id.*). Cosme seemed receptive, and Coughtry gave her orientation materials. (*Id.*). Cosme also reported that she had been involved in a physical altercation on a bus at the end of November. (*Id.*).

Cosme next met with Coughtry on January 15, 2014. (Tr. 475-78). Again, Coughtry spoke to Cosme concerning missing appointments, and Cosme explained that she had missed appointments due to a broken alarm clock and that she was committed to treatment. (*Id.*). Cosme also complained about having to work in the WEP program due to her seizures, but Coughtry explained that she would require an opinion from her medical doctor to disqualify her

from work due to her seizures.  (*Id.*).  On January 24, 2014, Cosme returned for another appointment that focused on her verbally aggressive behavior and ways to communicate non-aggressively.  (*Id.*).

Cosme attended another appointment with Coughtry on February 5, 2014. (Tr. 483-86).  During the appointment, Coughtry again counseled Cosme regarding her sporadic attendance, which Cosme blamed on her health, her alarm clock, and her son's failure to catch his bus for school.  (*Id.*).  Coughtry offered Cosme the option to receive only medication management through the clinic, but once again Cosme recommitted to treatment.  (*Id.*).  Cosme attended another appointment on February 12, 2014, during which she expressed a desire to cease smoking, and they talked about ways to help Cosme become less aggressive.  (Tr. 487-90). At another appointment on February 24, 2014, Cosme reported that she had to cancel her medication management appointment due to a commitment with the WEP program. (Tr. 491-94).  Coughtry discussed with Cosme ways to deal with her frustration.  (*Id.*).

During Cosme's next two appointments with Coughtry, which occurred on March 6 and 19, 2014, Cosme expressed anger regarding her sister and difficulties navigating her son's school system.  (Tr. 495-502).  Cosme expressed a desire to assault her sister, but discussed with Coughtry how the use of violence would have undesired consequences and would not likely resolve her issue.  (*Id.*).  Cosme met with Wagner on March 25, 2014 for a medication management appointment.  (Tr. 503-08).  Wagner noted that Cosme had missed her last two medication management appointments.  (*Id.*).  Wagner indicated that Cosme's mood had been stable since her last appointment and that she reported that her medications were effectively controlling her mood lability.  (*Id.*).  Cosme continued to report auditory hallucinations approximately every other day, but felt that her medication had reduced the intensity of the

hallucinations.  (*Id.*).  Cosme reported that her medication had also helped to improve her sleep.
(*Id.*).  Wagner continued Cosme's medications at the same dosages.  (*Id.*).

      Cosme returned for a therapy session with Coughtry on April 2, 2014.
(Tr. 509-12).  Cosme brought her son to the appointment because he had missed his school bus.
(*Id.*).  Coughtry noted that her son's attendance at school appeared to be an ongoing issue, and
she counseled Cosme regarding her need to ensure that her son attends school.  (*Id.*).

      On April 11, 2014, Cosme attended another therapy session with Coughtry.
(Tr. 513-16).  During the session, Cosme requested that Coughtry complete paperwork relating
to her claim for SSI.  (*Id.*).  Coughtry explained that EBHC had a policy against completing
disability forms.  (*Id.*).  During the remainder of the session, Coughtry counseled Cosme to use
progressive muscle relaxation as a way to calm her anger.  (*Id.*).  Cosme returned on April 24,
2014 and demonstrated ambivalence about addressing her violent behavior.  (Tr. 526-29).
Coughtry opined that although Cosme had exhibited less violence over the past few years, she
continued to have difficulty curbing her aggressive anger when confronted with perceived
injustices.  (*Id.*).  During the appointment, Cosme again expressed a desire to harm her sister
because her sister had posted negative comments on a social media site.  (*Id.*).

      During a May 14, 2014 therapy session, Coughtry counseled Cosme regarding her
irritability triggers and distress tolerance skills.  (Tr. 530-33).  Cosme continued to express anger
towards her sister, but seemed receptive to letting go of her anger and not acting on it.  (*Id.*).
Cosme met with Wagner on May 20, 2014 to monitor her medication.  (Tr. 534-39).  During the
appointment, Cosme reported that she believed her medications were effective in controlling her
mood and in decreasing the frequency and intensity of her auditory hallucinations, which
reportedly occurred a few times per week.  (*Id.*).  Cosme also reported that she was better able to

control her emotions, but that she had not been socializing frequently, although she had been exercising at a gym five days per week. (*Id.*).

On May 29, 2014, Cosme attended another therapy session with Coughtry. (Tr. 540). During the session she reported that she was "playing" her ex-boyfriend in order to obtain money from him, which had caused problems with her current boyfriend. (*Id.*). Coughtry encouraged Cosme to consider employment braiding hair, but Cosme indicated that she was not interested. (*Id.*). Coughtry counseled Cosme that her lack of income contributes to her vulnerability in relationships with others. (*Id.*).

**B.    Medical Opinion Evidence**

**1.    Adam Brownfeld, PhD**

On October 28, 2013, state examiner Adam Brownfeld ("Brownfeld"), PhD, conducted a consultative psychiatric evaluation of Cosme. (Tr. 376-80). Cosme reported that she walked to the examination. (*Id.*). Cosme also reported that she lives with her eight-year-old son. (*Id.*). She completed the ninth grade and had been placed in special education classes due to emotional disturbance. (*Id.*). Cosme reported previous employment as a dietary aide, but was fired after four months. (*Id.*). Cosme indicated that she is unable to work because she has difficulty being around other people. (*Id.*).

According to Cosme, she was previously hospitalized after a suicide attempt and was currently receiving therapy at EBHC. (*Id.*). At the time of the evaluation, Cosme was attending weekly therapy sessions and met with a psychiatrist every three months for medication management. (*Id.*). Cosme reported waking during the night, sleepwalking, and experiencing decreased appetite. (*Id.*). She complained of depression, indicated by dysphoric mood, crying spells, extreme irritability, diminished sense of pleasure, and social withdrawal. (*Id.*). Cosme

denied suicidal ideation or symptoms of anxiety.  (*Id.*).  According to Cosme, she experiences

panic attacks and blackouts when angry.  (*Id.*).  She also reported experiencing visual and

auditory hallucinations since childhood.  (*Id.*).  According to Cosme, she experiences

hallucinations several times per week and her last command hallucination was the previous

evening.  (*Id.*).  Cosme reported that she had not acted on a command hallucination for

approximately six months.  (*Id.*).  Cosme indicated that she suffered from cognitive and

short-term memory deficits.  (*Id.*).

Cosme reported that she did not have difficulty cooking, cleaning, doing laundry,

shopping, managing money, or caring for her personal hygiene on a day-to-day basis.  (*Id.*).

Cosme indicated that she was able to take public transportation, although she preferred not to do

so.  (*Id.*).  Cosme reported that she does not socialize and had a terrible relationship with her

family, but a very good relationship with her son.  (*Id.*).  Cosme stated that she likes to braid hair

and that she spends her days caring for her son, cleaning, and sleeping.  (*Id.*).

Upon examination, Brownfeld noted that Cosme appeared appropriately dressed

and casually groomed.  (*Id.*).  Brownfeld opined that Cosme had fluent and clear speech with

adequate language, coherent and goal-directed thought processes, full range and appropriate

affect, euthymic mood, clear sensorium, full orientation, fair insight, fair judgment and below

average intellectual functioning with a general fund of information that was appropriate to

experience.  (*Id.*).  Brownfeld noted that Cosme's attention and concentration were intact.  (*Id.*).

According to Brownfeld, Cosme was able to count, perform simple calculations and complete

serial threes.  (*Id.*).  Cosme's memory skills were mildly impaired likely due to emotional

distress secondary to depression.  (*Id.*).  According to Brownfeld, Cosme could recall three

objects immediately and three out of three objects after a delay. (*Id.*). Further, Cosme was able to recall four digits forward and three digits backwards. (*Id.*).

According to Brownfeld, Cosme could follow and understand simple directions and instructions, perform simple tasks independently, and maintain attention and concentration. (*Id.*). She had mild difficulties in her ability to maintain a regular schedule, learn new tasks, and perform complex tasks independently, but would not require supervision. (*Id.*). He also opined that Cosme was moderately to markedly limited in her ability to relate adequately with others and to appropriately deal with stress. (*Id.*). According to Brownfeld, Cosme appeared to suffer from psychiatric problems that could significantly interfere with her ability to function on a daily basis. (*Id.*). Brownfeld opined that Cosme's prognosis was good. (*Id.*).

### 2. **Eric Selesner, Psychology**

On November 13, 2013, agency medical consultant Eric Selesner ("Selesner"), PsyD, completed a Psychiatric Review Technique. (Tr. 117-18, 381). Selesner concluded that Cosme's mental impairments did not meet or equal a listed impairment. (Tr. 117-18). According to Selesner, Cosme suffered from mild limitations in her activities of daily living and moderate limitations in her ability to maintain social functioning and concentration, persistence or pace. (Tr. 118). According to Selesner, Cosme had not suffered from repeated episodes of deterioration. (*Id.*). Selesner completed a mental Residual Functional Capacity ("RFC") assessment. (Tr. 119-21). Selesner opined that Cosme suffered from moderate limitations in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without

interruptions from psychologically-based symptoms, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and set realistic goals or make plans independently of others.  (*Id.*).  Selesner opined that Cosme retained the ability to follow supervision and perform simple task work in a low contact setting, but would benefit from having limited contact with coworkers and the public.  (*Id.*).

### 3.     Mary Coughtry, Psychology

Coughtry completed a Monroe County Department of Human Services Psychological Assessment for Determination of Employability relating to Cosme on July 24, 2013.  (Tr. 390-93).  Coughtry indicated that Cosme had been diagnosed with depressive disorder, not otherwise specified, and borderline personality disorder.  (*Id.*).  Coughtry opined that Cosme was moderately limited in her ability to perform simple and complex tasks independently[4] and to maintain attention and concentration for role tasks.  (*Id.*).  According to Coughtry, Cosme was able to use public transportation and participate in work-related activities for up to five hours per week as long as she was not required to work with the public or others. (*Id.*).

On January 15, 2014, Coughtry completed another Psychological Assessment for Determination of Employability relating to Cosme.  (Tr. 394-97).  Again, Coughtry indicated that Cosme had been diagnosed with depressive disorder, not otherwise specified, and borderline personality disorder.  (*Id.*).  Coughtry opined that Cosme was moderately limited in her ability to perform simple and complex tasks independently, maintain attention and concentration for role

---

[4]  Coughtry also indicated that Cosme was not limited in her ability to perform simple and complex tasks independently; it is unclear whether she checked both boxes inadvertently.  (*Id.*).

tasks, and regularly attend to a routine and maintain a schedule. (*Id.*). According to Coughtry, Cosme was able to use public transportation and participate in work-related activities for up to five hours per week as long as she was not required to work with the public. (*Id.*).

  **C.**  **Application for Benefits**

   In her application for benefits, Cosme reported that she had been born in 1989. (Tr. 277). According to Cosme, she had previously been employed as a cashier and at a nursing home. (Tr. 312).

   Cosme reported that she lived in an apartment with her son and was able to feed him and care for his personal hygiene, although her mother and boyfriend assisted her financially. (Tr. 247-56). Cosme indicated that she is generally able to care for her personal hygiene, although she sometimes lacks the strength to care for her hair due to her depression and has trouble shaving. (*Id.*). She reported that she has difficulty sleeping and sometimes experiences panic attacks while sleeping. (*Id.*). Cosme stated that she was able to prepare her own meals daily and could perform indoor household chores without assistance, but needed help to complete outdoor chores. (*Id.*). Cosme reported that she leaves her house to attend group therapy and other appointments and is able to walk and use public transportation. (*Id.*). According to Cosme, she does not like to be around other people and is often concerned for her safety when outside of her house. (*Id.*). Cosme does not have a driver's license. (*Id.*). Cosme reported that she goes shopping once a month for approximately five hours and is able to handle her own finances. (*Id.*).

   According to Cosme, she styles hair for others when she needs money, but is easily frustrated. (*Id.*). She reported significant problems getting along with others and reported that she frequently gets into fights. (*Id.*). She reported difficulty maintaining attention,

completing tasks, and following spoken instructions.  (*Id.*).  She also reported hearing voices and talking to herself.  (*Id.*).

Cosme indicated that she frequently has the urge to assault other people and that she has previously lost employment due to her inability to control her emotions.  (*Id.*).  She also reported difficulty dealing with stress, changes in her schedule, and her memory.  (*Id.*).

### D.   <u>Administrative Hearing Testimony</u>

During the administrative hearing, Cosme testified that she lived with her eight-year-old son and that her only sources of income were payments from the Department of Social Services and her son's disability benefits.  (Tr. 87-88).  Cosme testified that she was not currently working and had not been employed since 2007, when she was approximately seventeen.  (Tr. 89).  At that time, she worked part-time in a nursing home preparing and passing out food, washing dishes, and removing garbage.  (*Id.*).  The job required her to work as part of a team.  (*Id.*).  She was terminated from that position after a confrontation with her manager.  (Tr. 89-90).  Cosme testified that she had also been employed at a fast food restaurant, but was terminated after a similar incident.  (Tr. 90-91).

According to Cosme, Coughtry had recommended that she utilize the services of Access VR in order to obtain employment.  (Tr. 91).  Cosme indicated that she had never used the services and that Coughtry had not completed the necessary paperwork because she told Coughtry that she was not interested in participating in the program.  (Tr. 91-92, 104).  Cosme indicated that she had attempted to obtain her GED on four separate occasions, but that she was unable to pass the test.  (Tr. 92).  Currently, Cosme works for five hours every Saturday cleaning a theater.  (Tr. 103).  According to Cosme, she primarily works alone, but becomes frustrated when she is told what to do or that she is doing something wrong.  (Tr. 103-04).

Cosme testified that she has been attending bimonthly counseling sessions with Coughtry for approximately three years and has been learning ways to manage her emotions. (Tr. 94). Cosme believed that her therapy was helping her, although she was involved in an altercation on a bus approximately six months before the hearing. (*Id.*).

Cosme testified that she sees her boyfriend every day and that they frequently go to the gym to exercise. (Tr. 95, 100). According to Cosme, she is able to go grocery shopping and has no trouble completing household chores, including cleaning and laundry. (Tr. 97). She also styles hair for family members. (Tr. 101). Cosme is unable to drive because she never attempted to obtain her permit and because she has a history of seizures. (Tr. 97).

Cosme reported that she experiences difficulty sleeping, although her medication sometimes helps her to sleep through the night. (Tr. 96). She also thought that her medications were helpful in addressing her mood swings and depression. (Tr. 96-97). According to Cosme, her energy level varies from day to day. (Tr. 101). She also testified that she experiences difficulty with concentration and focus and that she frequently "drift[s] off" while performing household chores. (Tr. 102).

Carol G. McManus ("McManus"), a vocational expert, also testified during the hearing. (Tr. 106-11, 323-24). The ALJ asked McManus to characterize Cosme's previous employment. (Tr. 106). According to McManus, Cosme previously had been employed as a cashier in a fast food restaurant and a dietary aide. (*Id.*).

The ALJ asked McManus whether a person would be able to perform Cosme's previous jobs who was the same age as Cosme, with the same education and vocational profile, and who was able to perform the full range of work at all exertional levels, but who was limited to jobs requiring an SVP level of 3 or below and could only occasionally interact with other

people, including the public, coworkers and supervisors.  (*Id.*).  McManus testified that such an

individual would be able to perform the jobs of cleaner/housekeeping, marker/ticketer, and file

clerk.  (Tr. 107).

   The ALJ then asked McManus whether jobs would exist for the same individual

with the same limitations, except that the individual could not interact with the general public or

coworkers and could only occasionally interact with supervisors.  (*Id.*).  McManus testified that

such an individual would be able to perform the jobs of cleaner/housekeeping and

marker/ticketer.  (Tr. 108).  According to McManus, those two positions would also require very

little interaction with a supervisor once the employment tasks were learned.  (*Id.*).  McManus

also testified that these positions might include jobs in which other employees are present, but

not in significant numbers.  (Tr. 110).

   Cosme's attorney asked McManus whether jobs would exist for the same

individual, who was limited to working five hours per week.  (Tr. 108).  McManus indicated that

such an individual could perform the requirements of the position, but would not be working at a

level of significant gainful activity.  (*Id.*).  Cosme's attorney then asked McManus whether a

person with no exertional limitations who would be off-task twenty-five percent of the time

would be able to maintain employment on a competitive basis.  (Tr. 108-09).  McManus opined

that such an individual would not be able to maintain full-time competitive employment.  (*Id.*).

According to McManus, a person could be off-task approximately ten percent of the time and

maintain employment.  (*Id.*).  McManus also testified that a person who was absent more than

three times per month would have difficulty maintaining employment.  (Tr. 110).

   At the conclusion of the hearing, the ALJ indicated that a medical source

statement from Coughtry or another treating physician would assist his determination.  (Tr. 112).

Cosme's attorney indicated that although Coughtry had been asked to complete a medical source statement, EBHC had a policy against providing medical source statements in connection with SSI proceedings.  (*Id.*).

**DISCUSSION**

I.      **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

> (1)   whether the claimant is currently engaged in substantial gainful activity;
>
> (2)   if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)   if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)   if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional
capacity to perform any other work that exists in significant
numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.      **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 17-25).  Under step one of the process, the ALJ found that Cosme had not

engaged in substantial gainful activity since August 1, 2013, the application date.  (Tr. 19).  The

ALJ noted, however, that Cosme had worked since the application date at levels that were below

the substantial gainful activity level.  (*Id.*).  At step two, the ALJ concluded that Cosme has the

severe impairments of bipolar disorder, schizoaffective disorder, and borderline personality

disorder.  (*Id.*).  The ALJ determined that Cosme's seizure disorder and foot problem were not

severe.  (*Id.*).  At step three, the ALJ determined that Cosme does not have an impairment (or

combination of impairments) that meets or medically equals one of the listed impairments.

(Tr. 19-20).  With respect to Cosme's mental impairments, the ALJ found that Cosme suffered

from no restrictions in activities of daily living, moderate difficulties in maintaining

concentration, persistence and pace, and marked difficulties in social functioning.  (Tr. 20).  The

ALJ concluded that Cosme has the RFC to perform the full range of work at all exertional levels,

but that she was limited to work involving an SVP[5] of three or lower and that she could have occasional contact with her supervisor but no contact with coworkers or the general public. (Tr. 20-24).  At steps four and five, the ALJ determined that Cosme had no past relevant work, but that other jobs existed in the national economy that Cosme could perform, including the positions of cleaner/housekeeper and maker/ticketer.  (Tr. 24-25).  Accordingly, the ALJ found that Cosme was not disabled.  (*Id.*).

### B.   Cosme's Contentions

Cosme contends that the ALJ's mental RFC determination is not supported by substantial evidence and is the product of legal error.  (Docket # 8-1).  First, Cosme maintains that the ALJ's RFC determination is not supported by substantial evidence because the ALJ selectively adopted only those portions of the medical record that supported his determination, failed to account for limitations assessed by Brownfeld, failed to apply correctly the treating physician rule to Coughtry's opinion, and formulated the RFC using his own lay opinion and interpretation of the medical record.[6]  (*Id.* at 14-22).  Next, Cosme contends that the ALJ erred by failing to develop the record by contacting Coughtry and requesting an updated opinion.  (*Id.* at 23).  Cosme also contends that the ALJ failed to apply the correct legal standards when evaluating her credibility by improperly considering her activities of daily living, by mischaracterizing her treatment history by stating that she had "sporadic attendance," and by mischaracterizing her history of physical altercations.  (*Id.* at 25-28).

---

[5]  "'SVP' stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job."  *Urena-Perez v. Astrue*, 2009 WL 1726217, *20 n.43 (S.D.N.Y.), *report and recommendation adopted as modified*, 2009 WL 1726212 (S.D.N.Y. 2009).

[6]  In a single sentence, Cosme maintains that the ALJ "failed to consider [p]laintiff's obesity in combination of her severe impairments."  (Docket # 8-1 at 13).  Plaintiff's obesity is not mentioned elsewhere in her submissions, nor did she identify obesity as one of her alleged impairments in connection with her administrative claim.  (Tr. 241, 267-68, 271-72, 325).  Accordingly, I conclude that plaintiff has failed to properly raise this issue, and I need not address it.  In any event, a review of the record does not demonstrate that plaintiff suffered work-related limitations due to her obesity, whether alone or in combination with her other impairments.

With respect to the ALJ's findings at steps four and five, Cosme maintains that the vocational expert's testimony cannot provide substantial evidence because it was based upon a flawed RFC assessment. (*Id.* at 28-29).

## II.   Analysis

### A.   Mental RFC Assessment

I turn first to Cosme's contention that the ALJ's RFC assessment was flawed. An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)). In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

Cosme argues that the ALJ improperly discounted the unfavorable portions of Coughtry's opinion. (Docket ## 8-1 at 13-15, 20-22; 15 at 5-6). According to Cosme, although the ALJ afforded "great weight" to Coughtry's opinion, he incorporated only the limitations identified by Coughtry that were favorable to his decision while rejecting the unfavorable limitations identified by Coughtry. (*Id.*). Cosme accuses the ALJ, in addition to inappropriate "cherry-picking" of the evidence, of failing to follow the treating physician rule because the

reasons the ALJ provided for rejecting the unfavorable portions of Coughtry's opinion were too

conclusory to constitute the "good reasons" required by the rule.  (*Id.*).

"An ALJ who refuses to accord controlling weight to the medical opinion of a

treating physician must consider various 'factors' to determine how much weight to give to the

opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must explicitly

consider:

(1)     the frequency of examination and length, nature, and extent
        of the treatment relationship,

(2)     the evidence in support of the physician's opinion,

(3)     the consistency of the opinion with the record as a whole,

(4)     whether the opinion is from a specialist, and

(5)     whatever other factors tend to support or contradict the
        opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010).  The regulations also

direct that the ALJ should "give good reasons in [his] notice of determination or decision for the

weight [he] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32

(quoting 20 C.F.R. § 404.1527(c)(2)).  "Even if the above-listed factors have not established that

the treating physician's opinion should be given controlling weight, it is still entitled to

deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992, *4

(W.D.N.Y. 2008).  The same factors should be used to determine the weight to give to a

consultative physician's opinion.  *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011).

"However, if the treating physician's relationship to the claimant is more favorable in terms of

the length, nature and extent of the relationship, then the treating physician's opinion will be

given more weight than that of the consultative examining physician." *See id.*

In his decision, the ALJ reviewed Cosme's medical records and Coughtry's medical assessment. (Tr. 21-23). The ALJ stated that he afforded Coughtry's medical assessment "[g]reat weight" because it assessed limitations in Cosme's ability to interact and relate to the public, which was supported by the treatment records. (*Id.*). In reaching this conclusion, the ALJ specifically accounted for these limitations in his RFC by limiting her to positions requiring no contact with coworkers or the general public and only occasional interaction with supervisors. (*Id.*). Cosme does not dispute that the ALJ's RFC assessment with respect to Cosme's ability to interact with others is generally consistent with the opinions contained in Coughtry's medical assessment. (Docket # 8-1 at 14-15). Instead, Cosme contends that the ALJ's RFC assessment failed to incorporate other limitations assessed by Coughtry, including limitations in her ability to maintain concentration and to work more than five hours per week. (Docket ## 8-1 at 15, 21; 15 at 5-6).

As a general matter, "the ALJ is not obligated to 'reconcile explicitly every conflicting shred of medical testimony,'" *Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (quoting *Gecevic v. Sec. of Health & Human Servs.*, 882 F. Supp. 278, 286 (E.D.N.Y. 1995)), and there is no "absolute bar to crediting only portions of medical source opinions." *Younes v. Colvin*, 2015 WL 1524417, *8 (N.D.N.Y. 2015). Yet, where the ALJ's "RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d at 297 (quoting Soc. Sec. Ruling 96-8p, 1996 WL 374184, *7 (1996)). Accordingly, an ALJ who chooses to adopt only portions of a medical opinion must explain his or her decision to reject the remaining portions. *See Younes v. Colvin*, 2015 WL 1524417 at *8 (although an ALJ is free to credit only a portion of a medical opinion, "when doing so smacks of 'cherry picking'

of evidence supporting a finding while rejecting contrary evidence from the same source, an administrative law judge must have a sound reason for weighting portions of the same-source opinions differently"); *Phelps v. Colvin*, 2014 WL 122189, \*4 (W.D.N.Y. 2014) ("[t]he selective adoption of only the least supportive portions of a medical source's statements is not permissible") (internal quotations and brackets omitted); *Caternolo v. Astrue*, 2013 WL 1819264, \*9 (W.D.N.Y. 2013) ("[i]t is a fundamental tenet of Social Security law that an ALJ cannot pick and choose only parts of a medical opinion that support his determination") (internal quotations omitted) (collecting cases); *Searles v. Astrue*, 2010 WL 2998676, \*4 (W.D.N.Y. 2010) ("[a]n ALJ may not credit some of a doctor's findings while ignoring other significant deficits that the doctor identified").

In this case, the ALJ carefully reviewed and summarized the medical records and Coughtry's opinion.  (Tr. 21-24).  Those records, according to the ALJ, demonstrated that Cosme received ongoing counseling and medication management at EBHC.  (*Id.*).  The treatment notes suggested that the medications were effective in addressing Cosme's mood fluctuations and reported hallucinations.  (*Id.*).  The notes, according to the ALJ, also demonstrated that during the course of her treatment, Cosme had been successful in decreasing physical altercations and learning non-aggressive techniques to deal with conflict.  (*Id.*).  Despite her progress, the ALJ agreed that the evidence supported Coughtry's opinion that Cosme would have difficulty performing jobs that required her to interact with others.  (*Id.*).  Accordingly, the ALJ adopted that portion of Coughtry's opinion.  (*Id.*).

In doing so, the ALJ rejected Coughtry's opinion that Cosme was able to work only five hours per week and that she suffered from significant attention and concentration limitations.  (Tr. 23).  The ALJ noted that these limitations were not supported by the record.

Specifically, the ALJ noted that these limitations were inconsistent with Coughtry's treatment

recommendations encouraging Cosme to utilize vocational services or obtain employment.  (*Id.*).

He also concluded that the limitations were inconsistent with Cosme's testimony that she was

looking for work and with her activities of daily living, which included caring for her young

child, maintaining household chores without assistance, and going to the gym five days per

week.  (*Id.*).

   Cosme maintains that the ALJ's decision to discount these limitations was

improper "cherry-picking" and that the reasons provided by the ALJ were too conclusory to

constitute "good reasons."  (Docket # 8-1 at 14-15, 21-22).  I disagree.  First, nothing in the

decision suggests that the ALJ inappropriately adopted only those limitations that supported his

ultimate finding; rather, the record demonstrates that he carefully reviewed the entire record and

adopted those limitations assessed by Coughtry that were supported by the record and declined to

adopt those that were unsupported.  *See Reyes v. Colvin*, 2016 WL 56267, *6 (W.D.N.Y. 2016)

(rejecting argument that ALJ selectively adopted only portions of medical opinion favorable to

his RFC assessment where the "RFC assessment in this case reflects adequate consideration of

plaintiff's . . . limitations in accordance with the requirements of the regulations, administrative

rulings, and case law, and is set forth with sufficient specificity to enable the court to decide

whether the determination is supported by substantial evidence") (internal quotations omitted).

   Further, I disagree with Cosme's contention that the ALJ failed to provide good

reasons for rejecting the hour and concentration limitations assessed by Coughtry.  As explained

above, the ALJ cited evidence in the treatment notes and Cosme's statements concerning her

activities of daily living as inconsistent with those limitations.  I conclude that the ALJ did not

violate the treating physician rule by rejecting certain opinions of Coughtry for the reasons he

explained.  *See Harrington v. Colvin*, 2015 WL 790756, *16 (W.D.N.Y. 2015) (ALJ properly

discounted treating physician opinion where it assessed limitations that were inconsistent with

findings contained in the treatment records and with admissions claimant had made concerning

his activities of daily living); *Wilferth v. Colvin*, 49 F. Supp. 3d 359, 362 (W.D.N.Y. 2014) (ALJ

properly weighed treating physician opinion and "adequately explained her reasons for declining

to grant controlling weight to his conclusion" where opinion was "inconsistent with other

opinions in the record, as well as statements made by the plaintiff himself, and none of the

objective test records . . . indicate[d] a level of disability greater than that reflected in the

plaintiff's RFC, as determined by the ALJ"); *Gladle v. Astrue*, 2008 WL 4411655, *5 (N.D.N.Y.

2008) (ALJ properly discounted opinion of treating physician where it was inconsistent with

treatment records and objective findings of the consultative examiner).

       I turn next to Cosme's contention that the ALJ's RFC assessment improperly fails

to account for some of the limitations identified in Brownfeld's opinion.  (Docket # 8-1 at

15-16).  Cosme maintains that despite giving "some weight" to Brownfeld's opinion, the ALJ

overlooked his opinion that Cosme suffered from stress-related limitations that would impair her

ability to work.  (*Id.*).  Additionally, Cosme contends that the ALJ ignored Brownfeld's

conclusion that Cosme appeared to suffer from psychiatric problems that might significantly

interfere with her ability to function on a day-to-day basis.  (*Id.*).

       I disagree.  "[W]hen determining whether mentally impaired individuals will be

able to adapt to the stress-related demands of the workplace, the ALJ is required to make a

thorough, individualized RFC evaluation, focusing on the individual's ability 'to understand,

carry out, and remember simple instructions; to respond appropriately to supervision, coworkers,

and usual work situations; and to deal with changes in a routine work setting.'"  *Reyes v. Colvin*,

2016 WL 56267 at *5 (quoting SSR 85-15, 1985 WL 56857, *4 (S.S.A. 1985)).  Having

reviewed the ALJ's decision, particularly his RFC assessment, I conclude that the ALJ has

complied with this requirement.

As described above, in formulating the RFC in this case, the ALJ relied upon his

review of the treatment notes, Cosme's testimony, and the opinions of Coughtry and Brownfeld.

Although both Coughtry and Brownfeld identified limitations in Cosme's ability to interact with

others, only Brownfeld explicitly opined that Cosme was "moderately to markedly limited" in

her ability to appropriately deal with stress.  (Tr. 376-80).  Despite this limitation, Brownfeld

opined that Cosme was able to follow and understand simple directions and instructions, perform

simple tasks independently, and maintain attention and concentration.  (Tr. 378).  He further

concluded that she had only mild limitations in her ability to maintain a schedule, learn new

tasks, and perform complex tasks independently, but that she would not require supervision.

(Tr. 378-79).  Similarly, Coughtry opined that Cosme had no limitations in her ability to follow,

understand and remember simple directions and instructions, and to perform low stress and

simple tasks.  (Tr. 396).

The ALJ's RFC finding explicitly required positions involving unskilled work[7]

that did not require any contact with coworkers or the public and only limited contact with

supervisors.  This conclusion is consistent with both Coughtry and Brownfeld's opinions that

Cosme had significant difficulties interacting with others, but was otherwise able to perform

simple work independently.  It is also supported by the medical records and Cosme's testimony,

which demonstrate that Cosme's difficulties stem primarily from her difficulty controlling her

emotions during interactions with others.  I find that the ALJ's RFC finding adequately

---

[7]  Although the ALJ limited Cosme to positions with an SVP of three or lower, each of the positions
identified at step five had an SVP of two, which is considered unskilled work.  SSR 00-4P, 2000 WL 1898704, *3
(S.S.A. 2000) ("unskilled work corresponds to an SVP of 1-2").

accounted for Cosme's limitations, including any limitations dealing with stress. *Steffens v. Colvin*, 2015 WL 9217058, *4 (W.D.N.Y. 2015) ("the RFC finding requiring low contact with coworkers and the public adequately accounted for plaintiff's stress"); *Reyes*, 2016 WL 56267 at *6 ("[i]n the court's view, although the ALJ did not specifically include stress limitations in his RFC assessment, his reliance on the findings and observations of the consultative medical sources in terms of their consideration of plaintiff's stress-related functional limitations, as well as his comprehensive consideration of the hearing testimony, objective medical evidence, and treating and consultative medical source opinions, represents the kind of thorough, individualized mental RFC evaluation contemplated by SSR 85-15 and the overall requirements of the Social Security regulations and rulings").

Similarly, Brownfeld's conclusion that Cosme's psychiatric problems might significantly interfere with her ability to function on a daily basis is not inconsistent with the ALJ's conclusion that Cosme could perform simple work tasks.  This is particularly true in the context of Brownfeld's entire opinion, which, as discussed above, essentially concluded that Cosme retained the ability to perform the basic mental demands of unskilled work.  *See Taylor v. Comm'r of Soc. Sec.*, 2015 WL 4649820, *5 (N.D.N.Y. 2015) (ALJ properly relied upon and considered consulting psychiatrist's opinion in determining that claimant's mental impairments were not severe; although psychiatrist opined that impairments could significantly interfere with daily functioning, psychiatrist also concluded that claimant "possessed requisite mental capacity for basic work activities"); *Williams v. Colvin*, 2014 WL 4146191, *9 (N.D.N.Y. 2014) (plaintiff's reliance on consultant's opinion that his psychiatric problems may significantly interfere with his daily functioning was misplaced where psychiatrist also concluded that plaintiff had no mental functioning limitations and plaintiff took the statement about daily

functioning out of context); *Cross v. Astrue*, 2009 WL 3790177, *6-7 (N.D.N.Y. 2009) (ALJ did not ignore consultant's opinion that claimant's mental impairments may significantly interfere with daily functioning where ALJ considered specific limitations assessed by consultant and where there was "little in [the] report to suggest [p]laintiff's psychological symptoms were so debilitating that she could not engage in any substantial gainful activity").

In reaching this conclusion, I also reject Cosme's contention that the ALJ's RFC assessment is an improper lay opinion, unsupported by the medical evidence. (Docket # 8-1 at 17-20). As explained in detail above, the ALJ thoroughly reviewed the record as a whole and formulated the RFC based upon the medical evidence contained in the record, including the opinions of Coughtry and Brownfeld.

I similarly reject Cosme's contention that the ALJ erred by failing to re-contact Coughtry to request an updated opinion as to Cosme's ability to meet the mental demands of work. (*Id.* at 23). According to Cosme, the ALJ noted during the hearing that a medical source statement from Coughtry, presumably one that was not in the form of a DSS employability assessment, would assist his determination of Cosme's claim. (*Id.*). Cosme maintains that it was improper for the ALJ to discount Coughtry's opinion without first attempting to obtain the additional opinion from Coughtry. (*Id.*). This argument lacks merit.

Although "[i]t is well established in the Second Circuit that an ALJ is under an obligation to develop the administrative record fully, to ensure that there are no inconsistencies in the record that require further inquiry, and to obtain the reports of treating physicians and elicit the appropriate testimony during the proceeding," *Martello v. Astrue*, 2013 WL 1337311, *3 (W.D.N.Y. 2013), I easily find that the ALJ satisfied his duty in this case. As an initial matter, the record contained several opinions from medical professionals, including Coughtry,

Brownfeld and Selesner, regarding Cosme's ability to perform the mental requirements of work.

Second, during the hearing, Cosme's counsel, who represents Cosme in connection with this

litigation, informed the ALJ not only that he would attempt to obtain the additional medical

source statement from Coughtry, but also that his attempt would likely be unsuccessful because

EBHC had a policy prohibiting their medical professional from completing such forms.

(Tr. 112).  Indeed, Coughtry's treatment notes indicate that she previously had refused to

complete an assessment when requested by Cosme.  (Tr. 513).  Finally, the record clearly

demonstrates that a medical source statement from Coughtry was requested by the SSA on

February 3, 2014.  (Tr. 283-92).  The request appears to have been denied by EBHC.

(Tr. 398-414).

> In any event, the relevant inquiry is whether the record was sufficient to support

the ALJ's RFC assessment.  *See Kunkel v. Comm'r of Soc. Sec.*, 2013 WL 4495008, *16

(W.D.N.Y. 2013) ("the issue is whether the record was adequate to permit the ALJ to determine

whether or not [p]laintiff was disabled").  As discussed above, I conclude that the record was

adequate to support the ALJ's RFC determination.

> Nothing in the record suggests that Cosme is unable to perform unskilled work

involving low contact with others.  Indeed, the record reflects that Cosme has made progress in

her mental health treatment and has benefitted from counseling and medication.  Additionally,

Cosme is able to care for her young son, maintain her household, go shopping, braid hair, and

visit a fitness center.  I conclude that the ALJ's RFC assessment was based upon a thorough

review of the record and was supported by substantial record evidence; accordingly, remand is

not warranted.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who

examined [claimant] indicated that she had anything more than moderate limitations in her

work-related functioning, and most reported less severe limitations[;] [a]lthough there was some

conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her

previous unskilled work was well supported").

     **B.**     **Credibility Assessment**

     I turn next to Cosme's contention that the ALJ's credibility analysis is flawed

because he applied the incorrect legal standards and mischaracterized the record.  (Docket ## 8-1

at 17-23; 15 at 8-9).

     An ALJ's credibility assessment should reflect a two-step analysis.  *Robins v.*

*Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011).  First, the ALJ must determine whether the

evidence reflects that the claimant has a medically determinable impairment or impairments that

could produce the relevant symptom.  *Id.* (citing 20 C.F.R. § 404.1529).  Next, the ALJ must

evaluate "the intensity, persistence and limiting effects of the symptom, which requires a

credibility assessment based on the entire case record."  *Id.* (citing 20 C.F.R. § 404.1529(c)).

The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration,
> frequency and intensity of the claimant's pain or other symptoms;
> (3) precipitating and aggravating factors; (4) the type, dosage,
> effectiveness, and side effects of any medication the claimant takes
> or has taken to alleviate [his] pain or other symptoms;
> (5) treatment, other than medication, the claimant receives or has
> received for relief of her pain or other symptoms; (6) any measures
> the claimant uses or has used to relieve her pain or other
> symptoms; and (7) other factors concerning the claimant's
> functional limitations and restrictions due to pain or other
> symptoms.

*Id.* (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)).

     The ALJ concluded that Cosme's statements "concerning the intensity,

persistence and limiting effects of [her] symptoms are not entirely credible for the reasons

explained in this decision." (Tr. 24). In doing so, the ALJ assessed Cosme's subjective complaints in the context of a comprehensive review of the entire record. I disagree with Cosme's contention that the ALJ applied the incorrect legal standard or mischaracterized the evidence.

As an initial matter, I disagree with Cosme to the extent that she suggests that the ALJ was not permitted to consider her activities of daily living in assessing her credibility. (Docket ## 8-1 at 25-26; 15 at 7-8). Although not necessarily determinative as to credibility, a claimant's daily activities may be considered in assessing credibility. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii). In his decision, the ALJ considered the entire record, including Cosme's daily activities and her history of treatment, along with the other factors described above. There is nothing in the ALJ's decision to suggest that his credibility determination relied solely upon Cosme's ability to perform various activities of daily living. Further, despite Cosme's contentions that she is able to perform "very limited" activities of daily living (Docket # 15 at 8), the record demonstrates that she engages in substantial activities, including cooking, cleaning, shopping, caring for her son, and exercising.

Cosme also maintains that the ALJ mischaracterized the record by indicating that Cosme mental health treatment was "sporadic." (Docket # 8-1 at 26-27). I disagree. Although Cosme correctly notes that the record demonstrates that she attended many appointments with Coughtry, the record also demonstrates that she frequently cancelled or failed to show for scheduled appointments and that Coughtry herself described Cosme's attendance as "sporadic." (Tr. 464, 475, 483, 503). Indeed, after reaffirming her commitment to treatment, Cosme continued to miss appointments, prompting Coughtry to suggest that she cease counseling

sessions altogether.  (Tr. 475, 483-84).  Accordingly, I conclude that the ALJ accurately described Cosme's treating history.

Next, Cosme maintains that the ALJ mischaracterized the evidence by stating that the record revealed "relatively few physical altercations since the alleged onset date."  (Docket # 8-1 at 27-28).  Again, Cosme cites to ample evidence in the record suggesting that she continued to suffer from difficulty managing her emotions and frequently expressed thoughts about engaging in or desires to resort to physical confrontations.  (*Id.*).  That evidence, however, is not inconsistent with the ALJ's observation that despite having those urges and emotions, Cosme infrequently acted on those urges after the alleged onset date.  Indeed, the evidence cited by Cosme in support of her argument includes only one instance of a physical confrontation – one that occurred on a bus in late November of 2013.  (*Id.*).  In other words, the record is consistent with the ALJ's recitation and characterization of the evidence.  The ALJ recognized that Cosme continues to have difficulty controlling her anger and interacting with others, and his credibility analysis and ultimate RFC assessment adequately accounted for those limitations.

In her reply papers, Cosme maintains that the ALJ improperly considered her "unhealthy personal relationships" in assessing her credibility.  (Docket # 15 at 7).  Cosme mischaracterizes the ALJ's decision.  In his decision, the ALJ noted that Cosme admitted to Coughtry that she was "playing" her ex-boyfriend in order to obtain money from him while at the same time lying to her boyfriend regarding the situation.  (Tr. 22).  While acknowledging that this admission was irrelevant to her alleged impairments, the ALJ noted that Cosme's admitted untruthfulness detracted from her credibility.  The ALJ did not err in doing so.

In sum, I conclude that the ALJ applied the proper legal standards in analyzing Cosme's subjective complaints and that substantial evidence supports the ALJ's determination

that Cosme's complaints were not entirely credible.  *See Luther v. Colvin*, 2013 WL 3816540, *7

(W.D.N.Y. 2013) (ALJ properly assessed subjective complaints where she "reviewed all of

[p]laintiff's subjective complaints . . . [and] properly considered [p]laintiff's activities of daily

living, inconsistent testimony and how her symptoms affected her attempts at maintaining a

job").

       **C.**     **Vocational Expert Testimony**

       Finally, I turn to Cosme's contention that the ALJ erred in relying on the

vocational expert because the hypothetical posed to the expert was based upon a flawed RFC

assessment.  (Docket # 8-1 at 28-30).  Having determined that substantial evidence supports the

ALJ's RFC determination, this argument is rejected.  *See Diakogiannis v. Astrue*, 975

F. Supp. 2d 299, 319 (W.D.N.Y. 2013) (citing *Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir.

2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC

finding, we necessarily reject [plaintiff's] vocational expert challenge")).

       **CONCLUSION**

       After careful review of the entire record, this Court finds that the Commissioner's

denial of SSI was based on substantial evidence and was not erroneous as a matter of law.

Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's

motion for judgment on the pleadings **(Docket # 14)** is **GRANTED**.  Cosme's motion for

judgment on the pleadings **(Docket # 8)** is **DENIED**, and Cosme's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


                                                        _s/Marian W. Payson_
                                                        MARIAN W. PAYSON
                                                     United States Magistrate Judge

Dated:  Rochester, New York
        August 5, 2016